# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| JOHN C. SCHWARTZ, D.D.S.<br>A PROFESSIONAL CORPORATION<br><br>Plaintiff,<br><br>v.<br><br>DELTA DENTAL PLANS<br>ASSOCIATION; DeltaUSA; DELTA<br>DENTAL INSURANCE COMPANY;<br>ARIZONA DENTAL INSURANCE<br>SERVICE, INC.; DELTA DENTAL<br>PLAN OF ARKANSAS, INC.; DELTA<br>DENTAL OF CALIFORNIA; DELTA<br>DENTAL OF COLORADO; DELTA<br>DENTAL OF DELAWARE, INC.;<br>DELTA DENTAL OF THE DISTRICT<br>OF COLUMBIA; HAWAII DENTAL<br>SERVICE; DELTA DENTAL PLAN OF<br>IDAHO, INC.; DELTA DENTAL OF<br>ILLINOIS; DELTA DENTAL PLAN OF<br>INDIANA, INC.; DELTA DENTAL OF<br>IOWA; DELTA DENTAL OF KANSAS,<br>INC.; DELTA DENTAL OF<br>KENTUCKY, INC.; MAINE DENTAL<br>SERVICE CORP.; DENTAL SERVICE<br>OF MASSACHUSETTS, INC.; DELTA<br>DENTAL PLAN OF MICHIGAN, INC.;<br>DELTA DENTAL OF MINNESOTA;<br>DELTA DENTAL OF MISSOURI;<br>DELTA DENTAL OF NEBRASKA;<br>DELTA DENTAL PLAN OF NEW<br>HAMPSHIRE, INC.; DELTA DENTAL<br>OF NEW JERSEY, INC.; DELTA<br>DENTAL PLAN OF NEW MEXICO,<br>INC.; DELTA DENTAL OF NEW<br>YORK, INC.; DELTA DENTAL OF<br>NORTH CAROLINA; DELTA<br>DENTAL PLAN OF OHIO, INC.;<br>DELTA DENTAL PLAN OF<br>OKLAHOMA; OREGON DENTAL | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

1    SERVICE; DELTA DENTAL OF
     PENNSYLVANIA; DELTA DENTAL
2    OF PUERTO RICO, INC.; DELTA
     DENTAL OF RHODE ISLAND;
3    DELTA DENTAL OF SOUTH
     DAKOTA; DELTA DENTAL OF
4    TENNESSEE, INC.; DELTA DENTAL
     PLAN OF VERMONT, INC.; DELTA
5    DENTAL OF VIRGINIA; DELTA
     DENTAL OF WASHINGTON; DELTA
6    DENTAL PLAN OF WEST VIRGINIA,
     INC.; DELTA DENTAL OF
7    WISCONSIN; AND DELTA DENTAL
     PLAN OF WYOMING,

8                    Defendants.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION AND SUMMARY ..................................................................... 2

PARTIES ................................................................................................................ 7

I.      Plaintiff ...................................................................................................... 7

II.     Defendants ................................................................................................. 7

JURISDICTION AND VENUE .......................................................................... 12

INTERSTATE AND INTRASTATE COMMERCE............................................ 13

FACTUAL ALLEGATIONS .............................................................................. 14

III.    Delta Dental's Insurance Plans ............................................................... 14

IV.     Structure of the Delta Dental System: Independent Companies and an Association ............................................................................................... 17

V.      Defendants' Market Allocation Scheme ................................................. 18

VI.     Defendants' Anticompetitive Compensation Of Dentists........................ 24

CLASS ACTION ALLEGATIONS .................................................................... 40

CAUSES OF ACTION ....................................................................................... 43

        COUNT ONE   NATIONWIDE INJUNCTIVE RELIEF UNDER THE SHERMAN ACT .................................................................... 43

        COUNT TWO   LOUISIANA MONETARY DAMAGES UNDER THE SHERMAN ACT .......................................................... 44

        COUNT THREE LOUISIANA MONETARY DAMAGES UNDER THE CARTWRIGHT ACT ..................................................... 45

PRAYER FOR RELIEF ...................................................................................... 46

JURY DEMAND.................................................................................................. 48

CLASS ACTION COMPLAINT

1. Plaintiff, John C. Schwartz D.D.S., a Professional Corporation, individually and on behalf of all others similarly situated, brings this action for (a) injunctive relief on behalf of a nationwide class of dentists in the Delta Dental provider network; (b) damages on behalf of a Louisiana class of dental service providers, against: (1) the Delta Dental Plans Association ("DDPA") and its subsidiary DeltaUSA; (2) the 39 independent Delta Dental companies (collectively, "Plans"), which are: Delta Dental Insurance Company ("DDIC"); Arizona Dental Insurance Service, Inc. ("Delta Arizona"); Delta Dental Plan of Arkansas, Inc. ("Delta Arkansas"); Delta Dental of California ("Delta California"); Delta Dental of Colorado ("Delta Colorado"); Delta Dental of Delaware, Inc. ("Delta Delaware"); Delta Dental of the District of Columbia ("Delta District of Columbia"); Hawaii Dental Service ("HDS"); Delta Dental Plan of Idaho, Inc. ("Delta Idaho"); Delta Dental of Illinois ("Delta Illinois"); Delta Dental Plan of Indiana, Inc. ("Delta Indiana"); Delta Dental of Iowa ("Delta Iowa"); Delta Dental of Kansas, Inc. ("Delta Kansas"); Delta Dental of Kentucky, Inc. ("Delta Kentucky"); Maine Dental Service Corp. ("Delta Maine"); Dental Service of Massachusetts, Inc. ("Delta Massachusetts"); Delta Dental Plan of Michigan, Inc. ("Delta Michigan"); Delta Dental of Minnesota ("Delta Minnesota"); Delta Dental of Missouri ("Delta Missouri"); Delta Dental of Nebraska ("Delta Nebraska"); Delta Dental Plan of New Hampshire, Inc. ("Delta New Hampshire"); Delta Dental of New Jersey, Inc. ("Delta New Jersey"); Delta Dental Plan of New Mexico, Inc. ("Delta New Mexico"); Delta Dental of New York, Inc. ("Delta New York"); Delta Dental of North Carolina ("Delta North Carolina"); Delta Dental Plan of Ohio, Inc. ("Delta Ohio"); Delta Dental Plan of Oklahoma ("Delta Oklahoma");

Oregon Dental Service ("Delta Oregon"); Delta Dental of Pennsylvania ("Delta Pennsylvania"); Delta Dental of Puerto Rico, Inc. ("Delta Puerto Rico"); Delta Dental of Rhode Island ("Delta Rhode Island"); Delta Dental of South Dakota ("Delta South Dakota"); Delta Dental of Tennessee, Inc. ("Delta Tennessee"); Delta Dental Plan of Vermont, Inc. ("Delta Vermont"); Delta Dental of Virginia ("Delta Virginia"); Delta Dental of Washington ("Delta Washington"); Delta Dental Plan of West Virginia, Inc. ("Delta West Virginia"); Delta Dental of Wisconsin ("Delta Wisconsin"); and Delta Dental Plan of Wyoming ("Delta Wyoming").  Defendants are referred to collectively herein as "Delta Dental" or "Defendants."

## INTRODUCTION AND SUMMARY

2.      The United States Supreme Court has repeatedly stated that "collusion is the supreme evil of antitrust." *F.T.C. v. Actavis, Inc.*, 133 S.Ct. 2223, 2233 (2013). The Supreme Court has also explained the types of collusion long condemned by the antitrust laws: "[C]ertain agreements, such as horizontal price fixing and market allocation, are thought so inherently anticompetitive that each is illegal *per se* without inquiry into the harm it has actually caused." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984).

3.      This is a class action brought on behalf of dental providers to enjoin an ongoing conspiracy between and among the individual Plans and their association, the DDPA, to allocate markets in violation of the prohibitions of the Sherman Act and Louisiana law.  In addition, this action seeks to recover damages for a class of dental providers.

4.      This case involves a contract, combination, or conspiracy among the

Defendants to allocate markets and geographic territories within the United States and its territories in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§1, 3, and Louisiana law,  La.R.S. 51:122.

5.    Delta Dental is a self-described network of independent companies identified above.  They conduct business in all 50 states, the District of Columbia, and Puerto Rico.  These Plans are all members of the DDPA.

6.    Defendants have entered into a horizontal market allocation agreement that is per se illegal under the antitrust laws.

7.    The Antitrust Division of the Department of Justice defines *per se* illegal market division as follows: "Market division or allocation schemes are agreements in which competitors divide markets among themselves. In such schemes, competing firms allocate specific customers or types of customers, products, or territories among themselves. For example, one competitor will be allowed to sell to, or bid on contracts let by, certain customers or types of customers. In return, he or she will not sell or, or bid on contracts let by, customers allocated to the other competitors. In other schemes, competitors agree to sell only to customers in certain geographic areas and refuse to sell to, or quote intentionally high prices to, customers in geographic areas allocated to conspirator companies."

8.    Defendant Plans are potential competitors who have agreed to allocate exclusive geographic markets.  Defendant Plans formalized and enforced this territorial market allocation scheme by means of the license agreements issued by Defendant DDPA.  These license agreements limit and restrict the ability of Defendant Plans to compete outside of their respective territorial markets.  Because

the officers of the Defendant Plans make up the Board of the DDPA, serve as the principal officers of the DDPA, and effectively exercise "complete and unfettered control over the operations of the association," *United States v. Topco Associates, Inc.*, 405 U.S. 596, 599 (1972), these license agreements constitute horizontal territorial market allocations that are *per se* unlawful under the antitrust laws.

9.     DDPA has confirmed the market allocation agreement in submissions to the WIPO Arbitration and Mediation Center.  WIPO reported that, according to DDPA, "its business is operated through 39 member companies" that are "licensed to offer services under the DELTA DENTAL mark in specific regions of the US. Each company has to use the mark in its company or legal trading name together with a geographic indicator describing its territory. In addition, each member must register a URL incorporating the DELTA or DELTA DENTAL trade names together with a geographic indicator."

10.     No "Delta Dental" plan is permitted to expand operations into another state or region where another "Delta Dental" plan is operating.

11.     The individual Plans have agreed not to compete against one another in their allocated market territories, which insulates individual Plans from competition in those areas.  This entrenches and perpetuates the dominant market position that each of them has historically enjoyed in their allocated market territories.  Their market power is the direct result of the illegal conspiracy to divide and allocate markets unlawfully.

12.     These restrictions, which have been followed by individual Plans, prevent competition that would otherwise occur among the Plans.  The Plans have

recognized that the brand restrictions curtail opportunities for growth in underserved regions of other states.  Likewise, Plans with stronger capital balances are unable to expand the brand outside their designated territories, which in turn limits their opportunities to seek profitable growth.

13.    The harm from Defendants' market allocation is reflected in suppression of compensation below levels that would prevail in a competitive marketplace to dental providers who have received reimbursement from any of the Defendants (hereinafter referred to as "Delta Dental Providers").

14.    As a result of Defendants' agreed-upon territorial restraints, Delta Dental's compensation to dental service providers was collusively and unlawfully suppressed below the level that would prevail in a competitive marketplace.

15.    The fact that the restraints may be imposed through licensing agreements with the DDPA does not make them less facially anticompetitive.  A recent decision out of the Northern District of Alabama held that analogous territorial restrictions by members of the Blue Cross Blue Shield Association ("BCBSA") are subject to *per se* review under the Sherman Act.  *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F.Supp.3d 1241 (N.D. Ala. 2018) ("*BCBS*"), *appeal denied,* 2018 WL 7152887 (11th Cir. Dec. 12, 2018).

16.    Delta Dental's practices have been condemned by dentists and state dental associations.  For example, the California Dental Association ("CDA") and some dentists sued Delta California, alleging contractual and unfair competition claims associated with Delta California's 2011 proposed reimbursement rate cuts for dentists under Delta California's standardized provider agreement for the Delta

Dental Premier network. *California Dental Ass'n, et al. v. Delta Dental of Cal.*, No. CGC 14-538849 (Cal. App. Dept. Super. Ct.). Similarly, the Washington State Dental Association filed a complaint in 2018 with the Antitrust Division of the Washington State Attorney General's Office, alleging that Delta Washington engaged in illegal practices.

17.    Judicial intervention is necessary to address Defendants' unlawful conduct. Without such intervention, Delta Dental's practices will continue to undercompensate dental providers who are part of its network and will result in harm to patients. Plaintiff therefore asks the Court to certify a nationwide class action for injunctive relief—the "Injunction class"—under Fed. R. Civ. P. 23(b)(2) and to certify a Louisiana damages class—the "Louisiana class"—under Fed. R. Civ. P. 23(b)(3) for treble damages.

18.    The Injunction class is defined as follows:

> All Delta Dental Providers, not owned or employed by any of the Defendants that provide dental goods or services to Delta Dental insureds pursuant to a Delta Dental insurance policy within the United States and its territories.

19.    The Louisiana class is defined as follows:

> All Delta Dental Providers in the State of Louisiana, not owned or employed by any of the Defendants, that provided dental goods or services to a Delta Dental insured pursuant to a Delta Dental insurance policy within the State of Louisiana.

-6-

# PARTIES

## I. Plaintiff

20.     Plaintiff John C. Schwartz D.D.S., is a dental services provider and a citizen of the State of Louisiana.  He is and was an owner and member a John C. Schwartz, D.D.S., a Professional Corporation ("Schwartz"), a dental practice located at 337 Metairie Rd, Suite 201, Metairie Louisiana 70005.  During the relevant time period, Schwartz provided covered dental goods and services to consumers insured by Defendants and was reimbursed for such services under Defendants' insurance plans. As a result of the anticompetitive conduct alleged herein, Schwartz was deprived of the choice of accepting dental patients under the greater number of insurance plans that he would have been able to choose from in a competitive market and was reimbursed less for providing dental goods and services than he would have been but for that anticompetitive conduct.  Schwartz has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

## II. Defendants

21.     Defendant DDPA is an Illinois nonprofit corporation located at 1515 West 22nd St., Ste. 450, Oak Brook, IL 60523.  DDPA is a national association of independent Delta Dental companies.  The DDPA's Board of Directors is composed almost entirely of the chief executive officers of the member Plans of the DDPA.  The member Plans vote on DDPA's actions and elect its officers, who are often officers of an individual Plan.

22.     Defendant DeltaUSA is an Illinois nonprofit corporation located at 1515 West 22nd St., Ste. 450, Oak Brook, IL 60523.  Throughout the class period,

DeltaUSA was a subsidiary of DDPA, and acted in concert with DDPA and the Plans to devise and implement the alleged contract, combination or conspiracy.  The member Plans of the DDPA vote on DeltaUSA's actions and elect its officers, who are often officers of individual Plans.

23.    Defendant DDIC is a Delaware Corporation with its principal place of business at 560 Mission St., #1300, San Francisco, CA 94105.  DDIC represents that it offers and administers Delta Dental PPO and other fee-for-service dental programs in Alabama, Florida, Georgia, Louisiana, Mississippi, Montana, Nevada, and Utah. DDIC also reports that it offers and administers fee-for-service dental programs and provides a dental provider organization plan in Texas.

24.    Defendant Delta Arizona is an Arizona nonprofit corporation located at 5656 West Talavi Blvd., Glendale, AZ 85306 and also conducts business as Delta Dental Plan of Arizona, Inc. and uses the trade name Delta Dental of Arizona.

25.    Defendant Delta Arkansas is an Arkansas corporation located at 1513 Country Club Road, Sherwood, AR 72120.

26.    Defendant Delta California is a California corporation located at 560 Mission St., #1300, San Francisco, CA 94105.

27.    Defendant Delta Colorado is a Colorado corporation located at 4582 S. Ulster St., Ste. 800, Denver, CO 80237.

28.    Defendant Delta Delaware is a Delaware corporation located at One Delta Drive, Mechanicsburg, PA 17055.

29.    Defendant Delta District of Columbia is a District of Columbia corporation located at One Delta Drive, Mechanicsburg, PA 17055.

1       30.     Defendant HDS is a Hawaii corporation located at 700 Bishop St., Ste.

2   700, Honolulu, HI 96813.

3       31.     Defendant Delta Idaho is an Idaho corporation located at 555 E.

4   Parkcenter Blvd., Boise, ID 83706.

5       32.     Defendant Delta Illinois is an Illinois corporation located at 111 Shuman

6   Blvd., Naperville, IL 60563.

7       33.     Defendant Delta Indiana is an Indiana corporation located at 225 S. East

8   St., Ste. 358, Indianapolis, IN 46202.

9       34.     Defendant Delta Iowa is an Iowa nonprofit corporation located at 9000

10  Northpark Drive, Johnston, IA 50131.

11      35.     Defendant Delta Kansas is a Kansas nonprofit corporation located at

12  1619 N. Waterfront Parkway, Wichita, KS 67206.

13      36.     Defendant Delta Kentucky is a Kentucky nonprofit corporation located

14  at 10100 Linn Station Rd., Ste. 700, Louisville, KY 40223, and may also conduct

15  business under the assumed name of Delta Dental Plan of Kentucky, Inc.

16      37.     Defendant Delta Maine does business as Delta Dental Plan of Maine,

17  Inc. and is a Maine nonprofit corporation located at 1022 Portland Rd., Ste. Two,

18  Saco, ME 04072-9674.

19      38.     Defendant Delta Massachusetts is a Massachusetts corporation located

20  at 465 Medford St. Boston, MA 20129, and Delta Massachusetts may also conduct

21  business under the name of Delta Dental of Massachusetts.

22      39.     Defendant Delta Michigan is a Michigan nonprofit corporation located

23  at 4100 Okemos Rd., Okemos, MI 48864, and Delta Michigan may also conduct

business under the assumed names of Delta Dental of Michigan, Inc. and Delta Dental Plan of Michigan.

40.     Defendant Delta Minnesota is a Minnesota nonprofit corporation located at 500 Washington Ave. South, Minneapolis, MN 55415.

41.     Defendant Delta Missouri is a Missouri nonprofit corporation located at 12399 Gravois Rd., St. Louis, MO 63127.

42.     Defendant Delta Nebraska is a Nebraska nonprofit corporation located at 1807 N. 169th Plaza, Ste. B, Omaha, NE 68118.

43.     Defendant Delta New Hampshire is a New Hampshire corporation located at 1 Delta Drive, Concord, NH 03301.

44.     Defendant Delta New Jersey is a New Jersey corporation located at 1639 Rte. 10, Parsippany, NJ 07054.

45.     Defendant Delta New Mexico is a New Mexico nonprofit corporation located at 2500 Louisiana Blvd., NE, Ste. 600, Albuquerque, NM 87110.

46.     Defendant Delta New York is a New York nonprofit corporation located at One Delta Drive, Mechanicsburg, PA 17055.

47.     Defendant Delta North Carolina is a North Carolina nonprofit corporation located at 4242 Six Forks Drive, Raleigh, NC 27609.

48.     Defendant Delta Ohio is an Ohio nonprofit corporation located at 550 Polaris Parkway, Ste. 550, Westerville, OH 43082, and Delta Ohio also conducts business under the fictitious name of Delta Dental of Ohio, Inc.

49.     Defendant Delta Oklahoma is an Oklahoma nonprofit corporation located at 201 Robert S. Kerr Ave., Oklahoma City, OK 73102.

50.     Defendant Delta Oregon is an Oregon nonprofit corporation located at 601 SW 2nd Ave., Portland, OR 97204, and also conducts business under the assumed business names of Delta Dental of Oregon and Delta Dental Plan of Oregon.

51.     Defendant Delta Pennsylvania is a Pennsylvania nonprofit corporation located at One Delta Drive, Mechanicsburg, PA 17055.

52.     Defendant Delta Puerto Rico is a Puerto Rican for profit corporation located at 14 Calle 2 Ste. 200, Guaynabo, PR 00968.

53.     Defendant Delta Rhode Island is a Rhode Island nonprofit corporation located at 10 Charles St., Providence, RI 02903.

54.     Defendant Delta South Dakota is a South Dakota corporation located at 124 S. Euclid Ave., Floor 2, Pierre, SD 57501, and also conducts business as Delta Dental Plan of South Dakota.

55.     Defendant Delta Tennessee is a Tennessee nonprofit corporation located at 240 Ventura Circle, Nashville, TN 37228.

56.     Defendant Delta Vermont is a Vermont nonprofit corporation located at 12 Bacon St., Ste. B, Burlington, VT  05401.

57.     Defendant Delta Virginia is Virginia corporation located at 4818 Starkey Rd., Roanoke, VA 24018.

58.     Defendant Delta Washington is a Washington nonprofit corporation located at 400 Fairview Ave. North, Ste. 800, Seattle, WA 98109.

59.     Defendant Delta West Virginia is a West Virginia corporation located at One Delta Drive, Mechanicsburg, PA 17055.

60.     Defendant Delta Wisconsin is a Wisconsin nonprofit corporation located

at 2801 Hoover Rd., Stevens Point, WI 54481.

61.    Defendant Delta Wyoming is a Wyoming corporation located at 6705 Faith Drive, Cheyenne, WY 82009.

## JURISDICTION AND VENUE

1.    Plaintiff brings federal antitrust claims under Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3), and under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26), as well as state law claims under La.R.S. 51:122.

2.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1331, 1337, and 1367.

3.    This Court has personal jurisdiction over each Defendant on multiple bases, including: (a) Defendant DDIC conducts business with dentists in Louisiana; (b) all of the Defendants have significant business in and contacts with Louisiana through national insurance programs, both through the provision of dental goods, services, and facilities to consumers insured by DDIC and by allocation of territories above; (c) all Defendants are co-conspirators and are part of the same contract, combination, or conspiracy; (d) all Defendants conspired with DDIC, DDPA, and DeltaUSA; (e) all of the Defendants use standardized forms prescribed by the DDPA and/or DeltaUSA in dealing with dentists; and (f) all of the Defendants require dentists who are in the individual provider networks of each Plan Defendant to accept patients of the other Defendants, often without compensation for services rendered.

4.    This Court therefore has personal jurisdiction over Defendants under Section 12 of the Clayton Act (15 U.S.C. § 22), because the Defendants transacted business in this District. This Court also has personal jurisdiction under Louisiana law

-12-

1   because Defendants participated in a conspiracy in which Delta Dental parent entities

2   and at least one conspirator committed acts in furtherance of the conspiracy in

3   Louisiana.  This Court also has jurisdiction because Defendants, in person or through

4   their agents and/or co-conspirators, transacted in business, contracted to supply goods

5   and services, regularly do business, and derive revenue within Louisiana.

6        5.      Venue is proper in this District under: (a) Section 12 of the Clayton Act

7   (15 U.S.C. § 22) because Defendants transact business in this District, and (b) 28

8   U.S.C. § 1391, because a significant part of the events, acts and omissions giving rise

9   to this action occurred in the District.

10                  **INTERSTATE AND INTRASTATE COMMERCE**

11       6.      Defendants' activities as set out in this Complaint have substantially

12  affected, and are within the flow of, interstate and intrastate trade and commerce.

13  Plaintiff, and members of the Louisiana class, provide services, goods, or facilities to

14  persons who reside in Louisiana.  Defendants' conduct as set forth in this Complaint

15  had substantial effects on intrastate commerce in that, *inter alia,* providers within

16  Louisiana were paid less, forced to accept far less favorable rates and other contract

17  terms, and had access to far fewer patients than they would have but for Defendants'

18  conduct.  Many of the Delta Dental Providers, including Plaintiff, provide services,

19  goods, or facilities to persons who reside in other states.

20       7.      The DDPA is involved in interstate and intrastate commerce.  It controls

21  many of the operations of each of the individual Plans, controls the marketing and use

22  of the "Delta Dental" brand by each of the Plans, and dictates the terms and conditions

23  of the standardized Delta Dental Provider Agreement that each Plan imposes on dental

-13-

service providers, such as dentists, who become part of the Delta Dental network.

**FACTUAL ALLEGATIONS**

**III.  Delta Dental's Insurance Plans**

8.    Delta Dental operates a variety of dental insurance health plans.  The Plans reimburse costs of dental services and goods that dentists provide to patients.

9.    Delta Dental Premier is a traditional fee for service plan that allows a subscriber to visit any licensed dentist and to change dentists without first obtaining permission from Delta Dental.  It offers the largest network of dentists.  These dentists have agreed to contracted fees with Delta Dental.

10.    Delta Dental PPO ™ is a preferred provider program, and Delta Dental PPO patients have access to a network of dentists who accept reduced fees for covered services.

11.    DeltaCare® HMO provides low-cost dental coverage with minimal or no copayments.  The focus is on preventive care and the subscriber chooses from a fixed network of dentists.

12.    DeltaCare® USA is a prepaid plan that features set copayments, no annual deductibles and no maximums for covered benefits.  The focus is on preventative care and the subscriber, in most states, selects a primary care dentist from the DeltaCare USA network.  In some states, DeltaCare USA is offered as an open access plan where enrollees can obtain treatment from any licensed dentist; however, deductibles and maximums may be applied to out-of-network treatment.

13.    Delta Dental Patient Direct is a dental service discount plan where the subscriber chooses from a panel of participating dentists who charge discounted fees.

1   The subscriber pays these fees to the dentist at the time of treatment.

2       14.    Delta Dental PPO Plus Premier combines the Delta Dental PPO and

3   Premier networks.  With this plan, even if a patient's Delta Dental Premier dentist is

4   not in the PPO network, the patient still receives the benefit of that dentist's contracted

5   fee.

6       15.    There is also a special Delta Dental plan for members of the American

7   Association of Retired Persons ("AARP").

8       16.    Delta Dental's website provides the following description of which Plans

9   provide these various services:

10          Delta Dental of California offers and administers Delta

11          Dental PPO™ and other fee-for-service dental programs for

12          groups headquartered in the state of California.

13          Delta Dental of New York offers and administers Delta

14          Dental PPO and other fee-for-service programs in New

15          York.

16          Delta Dental of Pennsylvania and its affiliates offer and

17          administer Delta Dental PPO and other fee for-service dental

18          programs in Delaware (Delta Dental of Delaware),

19          Maryland, Pennsylvania, West Virginia (Delta Dental of

20          West Virginia), and the District of Columbia (Delta Dental

21          of the District of Columbia).

22          Delta Dental Insurance Company offers and administers

23          Delta Dental PPO and other fee-for-service dental programs

-15-

to groups headquartered or located in Alabama, Florida, Georgia, Louisiana, Mississippi, Montana, Nevada and Utah, and vision programs to groups headquartered in West Virginia. In Texas, Delta Dental Insurance Company offers and administers fee-for-service dental programs and provides a dental provider organization (DPO) plan.

DeltaCare® USA is underwritten in these states by these entities: AL — Alpha Dental of Alabama, Inc.; AZ — Alpha Dental of Arizona, Inc.; CA — Delta Dental of California; AR, CO, IA, MA, ME, MI, MN, NC, ND, NE, NH, OK, OR, RI, SC, SD, VA, VT, WA, WI, WY — Dentegra Insurance Company; AK, CT, DC, DE, FL, GA, KS, LA, MS, MT, TN, WV — Delta Dental Insurance Company; HI, ID, IL, IN, KY, MD, MO, NJ, OH, TX — Alpha Dental Programs, Inc.; NV — Alpha Dental of Nevada, Inc.; UT — Alpha Dental of Utah, Inc.; NM — Alpha Dental of New Mexico, Inc.; NY — Delta Dental of New York, Inc.; PA — Delta Dental of Pennsylvania. Delta Dental Insurance Company acts as the DeltaCare USA administrator in all these states. These companies are financially responsible for their own products.

The AARP® Dental Insurance Plan is insured by Delta Dental Insurance Company (Contract 1230) in AK, AL, DC,

-16-

DE, FL, GA, LA, MD, MS, MT, NV, NY, PA, PR, TN, TX, UT, VI and WV, by Dentegra Insurance Company (Contract 1230) in AR, AZ, CA, CO, CT, HI, IA, ID, IL, IN, KS, KY, ME, MI, MN, MO, NC, ND, NE, NH, NJ, NM, OH, OK, OR, RI, SC, SD, VA, VT, WA, WI, and WY and by Dentegra Insurance Company of New England (Contract 1230) in MA.  The plan is administered by Delta Dental Insurance Company.  For Texas residents your Master Policy Form number is TX-AMD-MC-DPO-D-DC(DELTAUSA1-2005).  These companies are financially responsible for their own products.

17.    As can be seen from the foregoing descriptions, while Delta Dental Plans operate in various states and territories, they offer a common set of dental insurance programs from which subscribers can choose.

**IV.    Structure of the Delta Dental System: Independent Companies and an Association**

18.    The Delta Dental System is now the leading dental care insurer in the United States. One in three Americans with dental insurance are insured through Delta Dental—Delta Dental serves over 80 million Americans.  Three out of every four dentists in America are part of the Delta Dental System.

19.    Moreover, Delta Dental has a Research and Data Institute, which is advertised as "the world's most comprehensive collection of dental claims data, along with a staff of experts dedicated to analyzing and interpreting it."

-17-

20.    The DDPA is an association of the independent Delta Dental Plans.

21.    The Plans are members of, and govern, the DDPA.

22.    The DDPA is entirely controlled by its member Plans, all of whom are independent dental insurance companies or an affiliate of those companies.

23.    The Plans control the Board of Directors of the DDPA.  The Board of Directors of DDPA is comprised of Presidents and CEOs of the Delta Dental Plans.

24.    The DDPA promotes this group of independent companies as a single provider—"Delta Dental"—and names it as the nation's largest dental insurance covering more than 80 million Americans and providing the largest dental network in the nation.

25.    The DDPA is an instrumentality of the Plans. The Plans elect the Board and appoint the officers of the DDPA.  The members of the Board and the officers of the DDPA are officers of the Defendant licensees.  The Plans vote on any major actions of the DDPA.  The Plans thus exercise actual control over the major decisions of the DDPA.

**V.    Defendants' Market Allocation Scheme**

26.    Defendants have entered into a "contract, combination or conspiracy" to provide dental insurance under the "Delta Dental" brand in exclusive territories.

27.    Although the Defendant Plans do not compete with each other using the "Delta Dental" brand in any states or territories and have never done so since the Delta Dental organization was created, the independent Plans are potential competitors.

28.    The Plans have used their control over the DDPA to coordinate their activities.

29.     For example, each Plan entered into a licensing agreement with the DDPA, and Defendants used these agreements to restrain competition.

30.     The license agreements limit each Plan to compete on a branded basis only in its own state or region.  Thus, each Plan is only licensed to provide "Delta Dental" branded dental insurance in a single state or region and cannot operate outside the region using the "Delta Dental" name.  Through the license agreements and the DDPA, which the Plans create and control, each Defendant agrees that the Plans will not compete under the "Delta Dental" trademarks and trade names outside of their designated territory, and they will report no revenue received from other regions.  Some, like DDIC, do operate in multiple states, but use "DBAs" to operate in each of those states.  Those separate entities are licensed to do business only in particular regions, do not compete outside the borders of those regions, and report no revenue from other regions. Thus, the territorial restraints imposed upon Delta Dental Plans are nationwide.

31.     Each Defendant that is a licensee from the DDPA is an independent company or legal entity.  Because of the control that the Plans exercise over the DDPA, the territorial allocation imposed by the DDPA through these licenses is a territorial allocation that the Plans have agreed to implement.

32.     Because the DDPA is controlled by its member Plans, any agreement between the DDPA and one of its member Plans constitutes a horizontal agreement between and among the Plans themselves.

33.     Delta Dental Plans have a long history of using market allocation agreements to enrich themselves.   For example, the Michigan Dental Service

-19-

Corporation, which was the predecessor entity to Delta Michigan, was modeled on the medical health plans of the 1930s and 1940s.  At that time such health plans had an "exclusive service area" in which to operate free from like-branded competition.

34.    Similarly, the Plans are restricted to operating in specific territories in which they are authorized to operate.

35.    As DDPA informed the WIPO Arbitration and Mediation Center: "its business is operated through 39 member companies" that are "licensed to offer services under the DELTA DENTAL mark in specific regions of the US. Each company has to use the mark in its company or legal trading name together with a geographic indicator describing its territory. In addition, each member must register a URL incorporating the DELTA or DELTA DENTAL trade names together with a geographic indicator."

36.    The Delta Dental Plans' annual statements to state insurance departments also confirm that insurance premiums are "Allocated by States and Territories."  The statements also confirm that Defendants obtain revenues exclusively from their exclusive territories.  For example, the Delta Dental Plan of Arkansas reports revenue only from Arkansas, and the Delta Dental Plan of Rhode Island reports revenue only from Rhode Island.

37.    A number of the Plans have formal corporate relationships, which entrench the use of exclusive territories.

38.    For example, Dentegra Group, Inc. ("DGI") is a holding company for Delta California and other entities. A 2017 Delaware Department of Insurance Examiner's Report on DGI and its wholly owned subsidiary, Dentegra Insurance

Company, contained a chart of the "Insurance Holding Company System of Delta California," and is excerpted below:



As the chart demonstrates, other than Delta California and Delta Pennsylvania, some of the entities under the DGI umbrella are: (a) a number of Plans operated in Alabama, Georgia, Louisiana, Mississippi, Montana, Nevada, Texas, and Utah by DDIC, and (b) a number of Plans off of or along the Eastern Seaboard (Delta District of Columbia, Delta Puerto Rico, Delta Delaware, Delta New York, and Delta West

Virginia).

39.    Delta District of Columbia, Delta Delaware, and Delta West Virginia are all under the DGI umbrella.  Delta Pennsylvania is never going to permit those other Plans to compete directly with it or with Delta California and its affiliates. Similarly, DDIC, which falls under the DGI umbrella, reportedly serves the markets of Alabama, Florida, Georgia, Louisiana, Mississippi, Montana, Nevada, and Utah; it also offers and administers fee-for-service dental programs and provides a dental provider organization in Texas.  DDIC does not permit other Plans to compete freely and directly with it in those States, because all of those companies now purport to function as part of the DGI "enterprise structure."  In a truly competitive world, it is inconceivable that a company like Delta California, on the hunt for "fresh markets," would not have invaded other states.  Delta California refrained from doing so because of its web of DDPA-sanctioned "affiliations" and the chilling effect of the DDPA's policies of territorial allocation.

40.    The DGI family of Plans has publicly admitted Defendants' illegal territorial allocation.  The DGI family has a website with the below map:



The website goes on to state that "Delta Dental of California, Delta Dental of

Pennsylvania, Delta Dental of New York, Inc., and Delta Dental Insurance Company, together with their affiliate companies, form one of the largest dental benefits delivery systems in the country. We provide dental benefits plans in 15 states, the District of Columbia, Puerto Rico and the Virgin Islands. Our group of companies and affiliates are members of the Delta Dental Plans Association, a network of 39 independent Delta Dental member companies. This gives our enrollees access to some of the largest dentist networks nationwide."

41.    Renaissance Health Service Corporation ("Renaissance Health") is another holding company that wholly or partly owns or controls a number of Plans. A New York State Department of Financial Services Examiner's Report issued in February of 2018 about one of Renaissance Health's subsidiaries, the Renaissance Health Insurance Company of New York, contained an organizational chart illustrating the holdings of Renaissance Health, which is excerpted below.



CLASS ACTION COMPLAINT

42.    DDPA encouraged these affiliations" of "independent Delta Dental member companies."  As the DDPA stated in a 2015 Form 990 filed with the Internal Revenue Service ("IRS"):

THE ORGANIZATION HAS TWO CLASSES OF MEMBERSHIP - ACTIVE AND AFFILIATE  ANY DENTAL SERVICE CORPORATION THAT IS ACTIVELY ENGAGED IN ADMINISTERING A PREPAYMENT PROGRAM OR PROGRAMS IS ELIGIBLE FOR ACTIVE MEMBERSHIP  THE TERM "DENTAL SERVICES CORPORATION" MEANS ANY NOT-FOR-PROFIT CORPORATION ORGANIZED PRINCIPALLY TO PROVIDE DENTAL HEALTH CARE SERVICES BY MEANS OF CONTRACTS WITH DENTISTS  TO BE ELIGIBLE FOR AFFILIATE MEMBERSHIP, AN ORGANIZATION MUST BE (I) A NOT-FOR-PROFIT DENTAL CARE COMPANY THAT IS LOCATED OUTSIDE THE UNITED STATES, ITS TERRITORIES AND POSSESSIONS, OR (II) A CORPORATION, WHICH MAY BE A FOR-PROFIT CORPORATION (AND INCLUDING ANY ENTITY LOCATED OUTSIDE THE UNITED STATES, ITS TERRITORIES AND POSSESSIONS), WHICH DESIRES TO COOPERATE WITH THE ORGANIZATION AND/OR ITS AFFILIATES IN PROVIDING DENTAL PREPAYMENT PROGRAMS TO THE PUBLIC  AN ORGANIZATION WISHING TO BECOME A MEMBER MUST APPLY AND BE APPROVED FOR MEMBERSHIP  MEMBERS MAINTAIN THEIR MEMBER STATUS BY PAYING ANNUAL DUES AND ASSESSMENTS AND COMPLYING WITH THE ORGANIZATION'S MEMBERSHIP STANDARDS AND OTHER REQUIREMENTS  THE MEMBERS HAVE THE POWER (A) TO APPROVE AMENDMENTS TO THE ORGANIZATION'S ARTICLES OF INCORPORATION, BYLAWS AND THE MEMBERSHIP STANDARDS PORTION OF THE MEMBERSHIP STANDARDS AND GUIDELINES ADOPTED BY THE MEMBERS, (B) TO SET AND REVISE ANNUAL DUES, AND (C) TO ELECT AND REMOVE THE ORGANIZATION'S BOARD OF DIRECTORS

Under this approach, all members must "comply[] with the organization's membership standards and other requirements."  Therefore, companies cannot become members of DDPA unless they abide by DDPA's standards and requirements.

43.    Accordingly, efforts by a Plan using the "Delta Dental" brand to branch out of its territory and seek the business of an employer or group in another state would have been rebuffed.

44.    This restriction on competition enforced by the DDPA and implemented by its members and their affiliates is not in the individual self-interest of each Plan, as it limits each Plan's ability to grow and increase output, and effectively shackles it as a competitor.

## VI.    Defendants' Anticompetitive Compensation Of Dentists

45.    Defendants wield their considerable market power by compelling dentists to accept below-market reimbursement terms for the provision of dental services.

-24-

46.     These reimbursement terms do not fairly compensate dentists for those services.  Yet, Defendants are able to compel dentists to accept these terms through standardized provider service contracts that are offered on a "take it or leave it" basis, with no room for negotiation, and with complete control of rates and terms.

47.     If Delta Dental Plans could compete with each other in the territories in which other Delta Dental Plans operate, the resulting competition would provide dentists with more opportunities to receive fairer compensation.

48.     The American Dental Association ("ADA") has developed research which shows that dentists' average, inflation-adjusted net income from 2001–18 has declined significantly, due in large part to the anticompetitive conduct of Defendants. This decline is demonstrated in the below chronology:





49.    The figures on the chart—which depict nationwide average annual income for dentists— tend to mask the disparities at a state by state level. The following map, also from the ADA, shows average annual incomes by state for general dentists in 2018, which are sometimes significantly lower than the national average of $190,440.



-26-

1    50.    The decline in dental reimbursements that has squeezed dentists' earning

2    ability is shown on a state-by-state level in the following ADA chart:



| | % Change in Inflation-Adjusted Reimbursement |
|---|---|
| Alaska | -13.2% |
| Alabama | -9.8% |
| Arkansas | -9.8% |
| Arizona | -14.3% |
| California | -9.2% |
| Colorado | -11.4% |
| Connecticut | -2.2% |
| District of Columbia | -6.6% |
| Delaware | -6.7% |
| Florida | -9.5% |
| Georgia | -2.9% |
| Hawaii | -7.3% |
| Iowa | -3.7% |
| Idaho | -9.1% |
| Illinois | -4.7% |
| Indiana | -8.8% |
| Kansas | -6.0% |
| Kentucky | -11.3% |
| Louisiana | -8.5% |
| Massachusetts | -3.9% |
| Maryland | -9.6% |
| Maine | -7.5% |
| Michigan | -10.2% |
| Minnesota | -3.4% |
| Missouri | -10.0% |
| Mississippi | -5.1% |
| Montana | 15.5% |
| North Carolina | -8.2% |
| North Dakota | 1.3% |
| Nebraska | -3.7% |
| New Hampshire | -3.8% |
| New Jersey | -10.0% |
| New Mexico | -13.0% |
| Nevada | -9.6% |
| New York | -5.7% |
| Ohio | -7.6% |
| Oklahoma | -8.8% |
| Oregon | -7.2% |
| Pennsylvania | -10.8% |
| Rhode Island | -8.0% |
| South Carolina | -3.8% |
| South Dakota | 1.4% |
| Tennessee | -8.7% |
| Texas | -9.1% |
| Utah | -9.9% |
| Virginia | -6.9% |
| Vermont | -0.2% |
| Washington | -11.5% |
| Wisconsin | -6.5% |
| West Virginia | -5.0% |
| Wyoming | -9.4% |
| United States | -7.8% |

Reimbursement

% Change in Inflation-Adjusted Reimbursement to Dentists through Private Dental Insurance, 2002-17

1  All of this constitutes antitrust injury to members of the proposed Class.

2      51.    The fee agreements between Delta Dental and dentists are non-

3  negotiable.  Delta California's sample form provider agreement provides an example

4  of such an agreement:

5          **2. Basis of Fees.** A participating dentist will accept
           his or her "Contracted Fees"* fees with Delta Dental
6          as full payment for services provided to any eligible
           patient.* If the participating dentist does not have
7          a Contracted Fee with Delta Dental for a particular
           procedure submitted on an Attending Dentist's
8          Statement, payment will be based on a maximum
           amount as determined by Delta Dental applying the
9          same factors used for Contracted Fees.

10 The term "Contracted Fee" is defined in this sample agreement as follows:

11         "Contracted Fee" means the fee for each
           Single Procedure that a participating dentist has
12         contractually agreed with Delta Dental to accept as
           payment in full for treating Enrollees.

13         The "Contracted Fee" will be subject to a maximum
           amount allowed as determined by Delta Dental for
14         the network, specialty and location in which the
           dentist participates. The maximum amount is based
15         on an actuarial calculation, and taking into account
           filed fees, general inflation rates, health care
16         inflation rates, market pricing by competitors, and
           acceptability by customers. The maximum amount
17         will not be reduced unless participating dentists'
           filed or submitted fees decrease to such an extent
18         that Delta Dental is warranted in reducing the
           maximum amount allowed.

19 These fees are non-negotiable.

20     52.    Other Delta Dental provider contracts contain similar, non-negotiable fee

21 clauses.  For example, the Delta Virginia PPO form provider agreement states that

22 "[i]n our Delta Dental PPO program, we base our payments on Dental PPO

23 Allowances.  You agree to accept Delta Dental PPO Allowances as payment in full

-28-

for Covered Benefits that you provide to Delta Dental PPO Enrollees." Similarly, the Delta Colorado standard agreement for dentists in its Premier network states that "[t]he Corporation agrees to compensate the Dentist for covered benefits in the following manner. The submitted charge for any covered service will be compared to the Maximum Plan Allowance (the allowable amount as determined by Delta Dental for a procedure).  The lesser of the submitted charge or the Delta Dental Maximum Plan Allowance will be used to compute the patient copayment and compensation due to the Dentist from Corporation." Likewise, the Delta Rhode Island provider agreement states that "[t]he Dentist shall be compensated for the provision of Covered Services in accordance with (i) the compensation arrangements established by Delta Dental from time to time; and (ii) the terms and conditions of the agreements entered into from time to time by Delta Dental or other Qualified Entities regarding provision of dental services to covered persons."  And the Delta North Carolina PPO Provider Agreement states that "Delta North Carolina herein agrees to pay me for each commonly performed procedure performed by me to an eligible Delta North Carolina Subscriber in accordance herewith and covered by such subscriber's agreement with Delta North Carolina an amount equal to the Maximum Plan Allowance as established by Delta North Carolina and incorporated by reference herein, which fees may be amended from time to time by Delta North Carolina in its sole discretion."

53.     Among the unilateral and unfair pricing practices in which Defendants have recently engaged, Delta Dental Plans have imposed a series of onerous reimbursement fee cuts on dental providers in its network.

54.     For example, on June 15, 2011, WDS, the predecessor entity of Delta

Washington, imposed an average reduction of dentist compensation rates of 15% for providers in the Delta Dental Premier network and 5% for those in the Delta Dental PPO network.

55.    When dentists complained, the WDS's CEO, Jim Dwyer ("Dwyer"), remarked that they should just work harder. Meanwhile, by 2013 WDS's cash investments had reached $234 million and its premium revenues exceeded $1 billion. Aggregate compensation for Delta Washington Board members (excluding Dwyer) increased from $677,000 in 2015 to $1.28 million in 2016. Dwyer's compensation increased to $2.7 million in 2016, compared to $1.1 million in 2011.

56.    Similar types of rate decreases were implemented by Delta Dental Plans across the nation.

57.    In 2011, Delta Idaho reduced dental reimbursement fees between 4% and 13%; in June of 2012, the Plans in New Jersey and Connecticut engaged in similar reductions. Thereafter, Delta Missouri cut dentist reimbursements in Missouri by an average of 7% and the Plans in New Hampshire and Vermont implemented 4% rate cuts.

58.    Similar events occurred in California. In August of 2013, Delta California declined to honor its contractual commitment to dental service providers under its Premier Plan to calculate maximum reimbursement rates "based on actuarial calculation, and taking into account filed fees, health care inflation rates, market pricing by competitors, and acceptability by customers." Delta California instead allowed maximum fees that were in place as of January 1, 2011—over two years earlier—to remain in effect as the maximum allowable fee.

1    59.    This unilateral change in policy had the effect of eliminating language

2    in Delta California's dental service provider contracts that Delta California would

3    only lower its maximum amount payable if "participating dentists' filed or submitted

4    fees decrease to such an extent that Delta is warranted in reducing the maximum

5    amount allowed."

6    60.    In Massachusetts, beginning in 1990, Delta Massachusetts had used a

7    Consumer Price Index ("CPI") in calculating fees for dentists who provided services

8    pursuant to its Delta Premier network. Affected dentists challenged those fees before

9    the Massachusetts Department of Insurance ("MDOI"). In an opinion issued in April

10   of 2009, the MDOI condemned this fee methodology and ordered Delta

11   Massachusetts to replace it. The Hearing Examiner stated:

12           Delta has not justified why the cost to an urban consumer of

13           purchasing a basket of goods and services on a retail basis

14           constitutes a reasonable basis upon which to cap

15           reimbursements of Premier participating dentists. Delta has

16           not demonstrated that its CPI reflects a Massachusetts

17           dentist's cost of doing business. I am not persuaded that

18           these costs are tracked or mirrored by the consumer price

19           index that Delta employs.

20           In part, Delta defends its CPI adjustment because the prices

21           charged for dental services are included in its CPI under the

22           category of medical care. Delta, however, rejects the use of

23           the "dental CPI" for its adjustment, dismissing it as merely

-31-

1    an index of what dentists charge. The inclusion of retail
2    dental charges in Delta's CPI is no justification for its use,
3    for the same reason that Delta rejects use of the "dental CPI."
4    Justifying Premier's use of its CPI because it includes dental
5    charges for the region, furthermore, creates an intellectual
6    anomaly. Delta already collects Massachusetts-specific
7    information about the prices at which dental services are
8    billed when it collects the data on which Premier's
9    "customary fees" are based. Unlike Delta's CPI, the
10   "customary fees" are based specifically on the charges
11   submitted to Delta by Massachusetts dentists (their "usual
12   fees"). Delta has not explained why it is reasonable to cap
13   dental reimbursements to Massachusetts dentists by
14   reference to a CPI that contains within it dental charges made
15   by dentists in several states, when Massachusetts-specific
16   data has been collected.

17                              ****

18   Another problem with Delta's CPI adjustment is that, if the
19   CPI-driven nature of the April 1, 2008 periodic update is
20   duplicated for several periodic updates *ad seriatim*, the
21   "customary maximum allowable fee" for a procedure will
22   lag further and further behind the amount that lies at the 90th
23   percentile of participating dentists' "usual fees" for that

-32-

procedure. Over years of updates, the "customary" aspect of Premier's fee methodology would depart, for the vast majority of dental procedures, further and further from the reality of the 90th percentile at which Massachusetts dentists usually are charging their nonsubscriber patients. A fee methodology with such a dramatic disconnect is inherently unreasonable.

61.    Delta Massachusetts went back to the drawing board and came up with a revised fee methodology in 2009 for both Premier and PPO plans.  Dentists again challenged it and once again, a Hearing Examiner for MDOI determined that the bases for the new methodology were insufficient to justify its use.  Delta Massachusetts eventually adopted a fee methodology based on a consumer price index specifically applicable to dental services (the "Dental CPI").

62.    Then in 2016, Delta Massachusetts introduced Total Choice, a new PPO product that reimbursed dentists at about 25% to 30% less than they received under the then-current Premier Plan. Ellen Factor, director of dental practice and membership engagement services for the Massachusetts Dental Society, stated that "this PPO product was communicated to dentists with very short notice and caused considerable concern for dentists, employers and legislators."  The dentists in Massachusetts were forced to accept this new product offering or leave some of their patients without coverage for procedures. As noted in an October 2017 article published in the Worcester Business Journal:

Dentists complained to the Legislature on Monday that they

felt coerced into joining Delta Dental's new, lower-cost insurance plan, called Total Choice, and they asked lawmakers to impose more government control over the dental benefits giant.

Last year, Delta told dentists it was offering a new plan through a for-profit subsidiary of the non-profit parent and initially gave them about a month to sign onto the new network or face a "one-year lockout," Massachusetts Dental Society President David Lustbader told lawmakers.

Because of Delta's market share, dentists felt they had little choice but to join the Total Choice Preferred Provider Organization (PPO), and the lower rates paid to dentists under the plan have forced them to weigh tough business decisions, they told the Committee on Financial Services.

Lindi Ezekowitz, a pediatric dentist in Newburyport, said she couldn't afford to continue accepting both MassHealth patients and Total Choice PPO patients, so she no longer accepts Total Choice. Patients with that plan who choose to still see her must pay in full out of their own pockets.

"Those patients are suffering," Ezekowitz told the committee.

63.     Then, in July of 2019, Delta Massachusetts revised its fee methodology for Delta Dental Premier and Delta Dental PPO.  It abandoned the use of the Dental

-34-

CPI and announced that fees to providers would be reduced by 8.8% for non-incentive/standard fee schedule rates. That led to Delta Massachusetts sending a letter to the patients of dentists who had to drop out of the Delta Dental network because of these rate cuts, which stated, in part:

> I want you to know that [Dentist Name] at [location] **will no longer be a member of the Delta Dental® networks. This change will happen on September 30, 2019**. This means you and your family may pay more to get care with this dentist after September 30.
>
> Where you get your care is your choice. With Delta Dental, you have many options.
>
> You can stay with your current dentist. Just keep in mind that because he or she isn't in our network at this location anymore, your costs will likely be higher. You may also be asked to pay up front for your visit, and you may have to submit your own claims for reimbursement. If you want to stay with this dentist, ask if he or she is part of the Delta Dental networks at a different dentist office location.
>
> The good news is that nearly every other dentist in the state is in our networks. This means you should be able to find a number of Delta Dental dentists near your home, school, or work.

64. As Janis Moriarty, president of the Massachusetts Dental Society

-35-

explained in an article recently published in Dentistry Today, the letters were misleading.

> Delta's letter to patients is putting providers in an unfair and unfortunate position with respect to their patients by sending communications that are incomplete, and therefore misleading, and intrusive of the dentist-patient relationship.

> "Delta's letter informs patients that their dentist is no longer a member of the Delta network without any explanation as to why, but the why is relevant. The letter also warns patients that they may be asked to pay up front and pay out of pocket for treatment. Delta, of course, has imposed this burden on patients by disallowing the assignment of benefits. The MDS will continue to have discussions with Delta regarding the importance of adding assignment of benefits contract provisions to all its programs.

65.    Thomas O'Rourke, head of corporate communications at Delta Massachusetts asserted that its misleading letter was fully justified:

> We greatly value our relationships with providers and members. When dentists choose to discontinue their participation in our network, we have an obligation to inform our members, particularly when that change could result in a change in coverage or an increase in out-of-pocket costs
> The goal of these letters is to ensure that our members have

1        the information they need to make the best care decisions for

2        themselves and their family members and to give them the

3        information they need if they want to make a change.

4        66.    In an effort to minimize reimbursements to dentists, the Plans have

5   encouraged the migration of customers from the Delta Dental Premier Plan to the

6   Delta Dental PPO plan.  Under the Delta Dental PPO Plan, reimbursement rates are

7   not tethered to some dynamic Dental CPI or other type of index.  Instead, the Provider

8   Agreement under the PPO plan sets forth fixed compensation rates for specified dental

9   services.  As Delta Dental has explained: "participating dentists agree to scheduled

10  fees as payment in full."

11       67.    Those reimbursement rates do not change rapidly as a general matter and

12  can stay in place for years, even though a dentist's costs of providing service

13  (equipment, materials, labor, etc.) are continually rising.  Any gap between the fixed

14  Delta Dental PPO reimbursement rate and a dentist's usual and customary rate for the

15  service in question has to be written off by the dentist.  In a Delta Dental PPO, it is in

16  the interests of the relevant Delta Dental Plan to contain costs by encouraging dentists

17  to forego some services, like ensuring that a patient undergoes a regular dental

18  checkup every six months.

19       68.    The declining compensation for dentists contrasts starkly with the

20  salaries and benefits given to executives and directors of the ostensibly "not for profit"

21  Delta Plans.

22

23

69.    For example, based on its Form 990 filed with the IRS in 2016, Delta California's CEO was paid significantly more than his counterparts at much larger for profit, and not for profit, companies:

**CEO Total Compensation, 2016**

| | |
|---|---|
| Apple (116K employees, revenues of $216B) | $8.7 million |
| Anthem (53K employees, revenues of $85B) | $13.6 million |
| Delta Dental of CA (2K employees, revenues of $6B) | $14.3 million |

Sources: Delta Dental IRS Form 990, Apple and Anthem proxy statements.

70.    Likewise, Delta California spent $54 million in compensating its executives and Board of Directors in 2016, which constituted over one-fifth of total pay to company personnel, a percentage far exceeding other health-related companies:

**Exec & Director Pay as % of Total Personnel Costs**

| | |
|---|---|
| Delta Dental of CA (2K employees, $54M executive & director pay) | 21.0% |
| Blue Cross Blue Shield of MA (4.1 employees, $13M executive & director pay) | 4.4% |
| Geisinger Health Plan (1.5K employees, $4M executive & director pay) | 3.6% |

Sources: IRS Forms 990 for 2016, Part 1, Line 5 & Part IX, Lines 5 & 7

71.    And Delta California's executives received numerous other expensive executive perks:

-38-

**Delta Dental Executive Perks Reported on IRS Form 990**

| | | | |
|---|---|---|---|
| ✔ | First class or charter travel | ✔ | Housing allowance or residence for personal use |
| ✔ | Travel for companions | | Payments for business use of residence |
| ✔ | Tax indemnification and gross up payments | ✔ | Health or social club dues or initiation fees |
| | Discretionary spending account | ✔ | Personal services (e.g., maid, chauffer, chef) |

72.    Delta Washington provides another example of the contrast between what dentists earn and what Delta Dental Plan executives make.  As discussed *supra*, Dwyer, the former CEO of Delta Washington, was highly paid as of 2013.  He continued to be highly compensated, receiving a raise of $766,943 in 2016. Members of Delta Washington's Board, who work between seven and twelve hours a week, also got healthy raises: the then-board chair, Douglas Beck, got a raise from $96,732 in 2015 to $154,573 in 2016, even though he only worked an average of eleven hours per week.  Total executive and board compensation for Delta Washington in 2016 was about $10 million.

73.    A third example is Delta Massachusetts. A June 2017 article in the *Boston Globe* reported as follows:

> In 2015, the last year for which tax filings are available, eight executives at Delta Dental's parent company earned more than $1 million in total compensation, up from just one in 2011. Total compensation includes base salary, bonuses, and retirement benefits.
>
> By comparison, Blue Cross Blue Shield of Massachusetts, which has eight times the revenues, reported total

compensation of at least $1 million for seven executives in 2015, including almost $2.9 million for chief executive Andrew Dreyfus. The pay packages at Delta's parent company were also more generous than at Harvard Pilgrim Health Care and Tufts Health Plan, two other nonprofit insurers.

Delta's top earner in 2015 was the former president, Fay Donohue, who received more than $7 million in total compensation despite working just a few months before retiring that year; much of that sum came in the form of retirement benefits and was previously reported in tax filings.

Others who earned seven figures that year included Steven J. Pollock, who took over as president midyear and earned $2.4 million in total compensation, and Sheryl Traylor, senior vice president of human resources, who earned $2.6 million.

74.    All of the foregoing indicates that Delta Dental Plans are profiting extensively off the backs of the dental care providers in the Delta Dental network.

## **CLASS ACTION ALLEGATIONS**

75.    Plaintiff brings this action on their own behalf and as a class action on behalf of a nationwide injunctive class under Rules 23(a) and Rule 23(b)(1) and (b)(2) of the Federal Rules of Civil Procedure, and seeks injunctive relief on behalf of the

-40-

following class (the "Injunction Class"):

> All Delta Dental Providers, not owned or employed by any
> of the Defendants, that provide dental goods or services to
> Delta Dental insureds pursuant to a Delta Dental insurance
> policy within the United States and its territories.

76. Plaintiff also brings this action on behalf of themselves and as a class action under Rules 23(a) and Rule 23(b)(1) and (b)(3) of the Federal Rules of Civil Procedure, and seeks monetary damages on behalf of the following Louisiana class, also represented by Plaintiff. It is defined as follows:

> All Delta Dental providers in the State of Louisiana not
> owned or employed by any of the Defendants, that provided
> dental goods or services to a Delta Dental insured pursuant
> to a Delta Dental insurance policy within the State of
> Louisiana.

77. These two classes will be referred to collectively herein as the "Class."

78. Plaintiff believes there are thousands of members of the Class, the exact number and their identities being known by Delta Dental, making Class members so numerous and geographically dispersed that joinder of all members is impracticable.

79. There are numerous questions of law and fact common to each Class member, including, but not limited to:

> (a)  Whether the conduct of Defendants alleged in this complaint
> constituted an unlawful market allocation;
>
> (b)  Whether the conduct of Defendants alleged in this complaint

-41-

1    caused damages to Plaintiff and other members of the Class and

2    the amount and extent of those damages; and

3    (c)    Whether the conduct of Defendants alleged in this complaint is

4    ongoing and should be enjoined.

5    80.    Plaintiff is a member of the Class, has claims that are typical of the

6    claims of the Class members, has interests coincident with and not antagonistic to

7    those of the other members of the Class, and will fairly and adequately protect the

8    interests of the members of the Class. In addition, Plaintiff is represented by counsel

9    who are competent and experienced in the prosecution of antitrust and class action

10    litigation.

11    81.    The prosecution of separate actions by individual members of the Class

12    would create a risk of inconsistent or varying adjudications.

13    82.    The questions of law and fact common to the members of the Class

14    predominate over any questions affecting only individual members, including legal

15    and factual issues relating to liability and damages.

16    83.    A class action is superior to other available methods for the fair and

17    efficient adjudication of this controversy.  Treatment as a class action will permit a

18    large number of similarly situated persons to adjudicate their common claims in a

19    single forum simultaneously, efficiently and without the duplication of effort and

20    expense that numerous individual actions would engender.  The Class is readily

21    definable and is one for which records should exist in the files of DDPA and/or the

22    Plans or others, and a class action will eliminate the possibility of repetitious

23    litigation.

CLASS ACTION COMPLAINT

84.    Class treatment will also permit the adjudication of relatively small claims by many members of the Class who otherwise could not afford to litigate claims such as those asserted in this Complaint.    This class action presents no difficulties of management that would preclude its maintenance as a class action.

## CAUSES OF ACTION

## COUNT ONE

## NATIONWIDE INJUNCTIVE RELIEF UNDER THE SHERMAN ACT

85.    Plaintiff incorporates the allegations set forth in the foregoing paragraphs as though set forth herein.

86.    This is a claim for nationwide injunctive relief under Section 16 of the Clayton Act (15 U.S.C. § 26) brought by Plaintiff on behalf of all Delta Dental providers, not owned or employed by any of the Defendants, that provide dental goods or services to Delta Dental insureds pursuant to a Delta Dental insurance policy within the United States and its territories.

87.    Defendants' concerted acts of market allocation, output restraint and suppression of compensation as described herein constitute *per se* violations of Sections One and Three of the Sherman Act (15 U.S. C. §§ 1 , 3) or, at least, are subject to a "quick look" rule of reason analysis.

88.    Defendants' unlawful conduct threatens to continue to injure Plaintiff and members of the Injunction Class.    Plaintiff seeks a permanent injunction prohibiting Defendants and all others acting in concert from continuing their illegal contract, combination, or conspiracy and ordering them to take appropriate remedial action to correct and eliminate any remaining effects of their illegal contract,

combination, or conspiracy.

89.    Plaintiff reserves the right to seek preliminary injunctions as necessary.

## COUNT TWO

## LOUISIANA MONETARY DAMAGES UNDER THE SHERMAN ACT

90.    Plaintiff incorporates the allegations set forth in the foregoing paragraphs as though set forth herein.

91.    Plaintiff brings this claim under Section Four of the Clayton Act (15 U.S.C. § 15) for treble damages and interest on behalf of all Delta Dental providers in the State of Louisiana, not owned or employed by any of the Defendants, that provided dental goods or services to a Delta Dental insured pursuant to a Delta Dental insurance policy within the State of Louisiana.

92.    As alleged more specifically above, Defendants have engaged in a market allocation scheme that represents a contract, combination, and conspiracy in restraint of trade within the meaning of Section One and Three of the Sherman Act (15 U.S.C §§ 1, 3).

93.    Defendants have agreed to divide and allocate the geographic markets for the provision of dental insurance into a series of exclusive territories for each of the Plans.  By so doing, Defendants have also conspired to suppress competition and reduce compensation to dental Providers in violation of Sections One and Three of the Sherman Act.  Due to the lack of competition which results from Defendants' illegal conduct, dental providers are undercompensated for those services. Defendants' anticompetitive acts are illegal *per se* under Section One and Three of the Sherman Act or are subject to a "quick look" rule of reason analysis.

-44-

94.     As a direct and proximate result of Defendants' continuing violations of Section One and Three of the Sherman Act, Plaintiff and members of the Louisiana class have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent.  Such injury flows directly from that which makes Defendants' conduct unlawful.  These damages consist of having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

## COUNT THREE

## LOUISIANA MONETARY DAMAGES UNDER THE CARTWRIGHT ACT

95.     Plaintiff incorporates the allegations set forth in the foregoing paragraphs as though set forth herein.

96.     Plaintiff brings this claim under La.R.S. 51:122 for treble damages and interest on behalf of all Delta Dental providers in the State of Louisiana, not owned or employed by any of the Defendants, that provided dental goods or services to a Delta Dental insured pursuant to a Delta Dental insurance policy within the State of Louisiana.

97.     As alleged more specifically above, Defendants have engaged in a market allocation scheme that represents a contract, combination, and conspiracy in restraint of trade within the meaning of Louisiana law.

98.     Defendants have agreed to divide and allocate the geographic markets for the provision of dental insurance into a series of exclusive territories for each of the Plans.  By so doing, Defendants have also conspired to suppress competition and

reduce compensation to dental Providers in violation of La.R.S. 51:122. Due to the lack of competition which results from Defendants' illegal conduct, dental providers are undercompensated for those services. Defendants' anticompetitive acts are illegal *per se* or, at least, are subject to a "quick look" rule of reason analysis.

99.    The challenged agreements entered into between and by Defendants have had substantial and unreasonable anticompetitive effects such as those set forth above, including but not limited to:

(a)    Reducing the number of dental insurance companies competing with DDIC in Louisiana;

(b)    Unreasonably limiting the entry of competitor dental insurance companies into Louisiana;

(c)    Allowing DDIC to maintain and enlarge its market power throughout Louisiana; and

(d)    Paying below-market reimbursement rates to dentists.

100.    As a direct and proximate result of Defendants' continuing violations of Louisiana law described in this Complaint, Plaintiff and other members of the Louisiana class have suffered injury and damages in an amount to be proven at trial. These damages consist of having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the proposed Class of similarly situated persons and entities, respectfully request that the Court:

-46-

a.  Determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure and appoint Plaintiff as Class Representative, and Counsel for Plaintiff as Class Counsel;

b.  Adjudge and decree that Defendants have violated Section 1 and 3 of the Sherman Act;

c.  Adjudge and decree that Defendants have violated La.R.S. 51:122;

d.  Permanently enjoin Defendants from entering into, or from honoring or enforcing, any agreements that restrict the territories or geographic areas in which any of the Delta Dental Plans may compete;

e.  Permanently enjoin Defendants from retaliating against any Plaintiff for participation in the litigation or enforcement of any remedy;

f.  Require ongoing periodic reporting on compliance by the Defendants, monitoring by the Court, and a process through which class members will be represented in any compliance issue at Defendants' cost, all of which should continue until Defendants show that they have corrected the effects of their illegal conduct;

g.  Award the Plaintiff and the Louisiana class treble the amount of damages suffered by Provider Plaintiff and members of the Louisiana class as proven at trial;

h.  Award costs and attorneys' fees to Plaintiff;

i.  Award prejudgment interest; and

j.  Award any such other and further relief as may be just and proper.

-47-

1

## <u>JURY DEMAND</u>

2          Pursuant to Fed. R. Civ. P. 38(c), Plaintiff demands a trial by jury on all issues

3    so triable.

4    Date: January 3, 2020                    Respectfully submitted,

5                                             <u>/s/ Edgar D. Gankendorff</u>
     Charles J. Cooper*                       Henry Saint Paul Provosty
6    COOPER & KIRK, PLLC                      (Bar Number 02056)
     Harold S. Reeves*                        Edgar D. Gankendorff, Esq.
7    Davis Cooper*                            (Bar Number 20550)
     1523 New Hampshire Avenue, N.W.          Eric Belin, Esq. (Bar Number 27168)
8    Washington, D.C. 20036                   PROVOSTY & GANKENDORFF, L.L.C.
     (202) 220-9600 (phone)                   650 Poydras St., Suite 2700
9    (202) 220-9601 (fax)                     New Orleans, LA 70130
     ccooper@cooperkirk.com                   (504) 410-2795 (phone)
10                                            egankendorff@provostylaw.com
     Chris T. Hellums*                        ebelin@provostylaw.com
11   Jonathan S. Mann*                        hprovosty@provostylaw.com
     PITTMAN, DUTTON & HELLUMS, P.C.
12   2001 Park Place N., Suite 1100           William A. Isaacson*
     Birmingham, AL 35203                     Melissa Felder Zappala*
13   (205) 322-8880 (phone)                   BOIES SCHILLER FLEXNER LLP
     (205) 328-2711 (fax)                     1401 New York Avenue, NW
14   chrish@pittmandutton.com                 Washington, DC 20005
     jonm@pittmandutton.com                   (202) 237-2727 (phone)
15                                            (202) 237-6131 (fax)
                                              wisaacson@bsfllp.com
16                                            mzappala@bsfllp.com

17                                            David Boies*
                                              BOIES SCHILLER FLEXNER LLP
18                                            55 Hudson Yards
                                              New York, NY 10001
19                                            (212) 446-2300 (phone)
                                              (212) 446-2350 (fax)
20                                            dboies@bsfllp.com

21
     *Application to appear *pro hac vice* forthcoming
22
     **Counsel for Plaintiff**
23